EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 11-37-GWU

BOBBY MORRIS, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of

impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments). If so, disability is conclusively presumed and benefits are awarded.

4. At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work. If so, the claimant is not disabled and the claim is denied. If the plaintiff carries this burden, a prima facie case of disability is established.

5. If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher

v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional

impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Id. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Bobby Morris, was found by an Administrative Law Judge (ALJ) to have “severe” impairments consisting of low back pain secondary to degenerative changes of the lumbar spine, and histoplasmosis. (Tr. 16). Nevertheless, based in part on the testimony and reports of two Medical Experts (ME) and a Vocational Expert (VE), the ALJ found that Mr. Morris retained the residual functional capacity to perform his past relevant work as a plant laborer and coal miner, and therefore was not entitled to benefits. (Tr. 18-22). The Appeals Council declined to review, and this action followed.

At the second of two administrative hearings, the ALJ asked the VE whether a person of the plaintiff’s age of 33 to 35, high school education, and work

experience could perform any jobs if he were limited to lifting 50 pounds occasionally and 25 pounds frequently, could only occasionally crouch and crawl, and needed to avoid all exposure to fumes. (Tr. 33). The VE testified that such a person could perform the plaintiff's past work as a plant laborer. (Id.).[1]

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.

Mr. Morris alleged disability beginning December 24, 2005 due to histoplasmosis, and back and neck problems.[2] (Tr. 135). He submitted treatment notes from several sources, most importantly, from Dr. Bekoe Opoku-Owusu, a physician with the Infectious Disease Service of ARH Hazard Family Health Clinic. The physician treated the plaintiff beginning in January, 2007 after the plaintiff sought treatment for shortness of breath and productive sputum. (Tr. 729, 736-39). He was eventually given the diagnosis of histoplasmosis after other possibilities

---

[1]The VE testified that the plaintiff's coal mining job was in the "very heavy" range of exertion (Tr. 33), which would make it incompatible with the hypothetical factors. Therefore, the ALJ was in error in finding that the plaintiff could return to coal mining. However, the plaintiff has not raised this issue on appeal, and, in any case, the testimony does support a finding that the plaintiff could perform the job of plant laborer. Any error is harmless.

[2]Histoplasmosis is defined as "infection resulting from inhalation or, infrequently, the ingestion of spores of *Histoplasma capsulatum*. . . . The infection is asymptomatic in most cases, but in 1-5 per cent, it causes acute pneumonia, or disseminated reticuloendothelial hyperplasia with hepatosplenomegaly and anemia, or an influenza-like illness with joint effusion and erythema nodosum. Reactivated infection involves the lungs, meninges, heart, peritoneum, and adrenals in that order of frequency." Dorland's Illustrated Medical Dictionary, 27th Ed., p. 770.

were ruled out. There was some confusion about the diagnosis in August, 2007 after a lung biopsy, but Dr. Opoku-Owusu had referred the plaintiff to pulmonologists at the University of Kentucky Medical Center (UKMC) who confirmed the diagnosis of histoplasmosis. (Tr. 1420-24). Dr. J. McCormick of UKMC noted on November 29, 2007 that repeat fungal serologies were positive for histoplasma and a CT scan of the chest showed evidence of multiple pulmonary nodules. (Tr. 1420). However, pulmonary function testing was essentially normal, with no significant obstruction. (Tr. 1421). Dr. Opoku-Owusu's follow-up notes in 2007 and 2008 generally show that the plaintiff was having no chest pain, dizziness, or syncopal episodes, although he complained of "smothering" on and off, chest pain, and night sweats. (Tr. 1427-34). The physician's examinations consistently showed adequate breath sounds and no wheezing. He described the plaintiff's chest pain as pleuritic in nature. (Tr. 1427, 1433, 1466). In November, 2008, he stated that Mr. Morris was "overall, in a stable baseline state of health," laboratory testing showed negative histoplasmosis urinary antigens, and a chest x-ray showed unchanged pulmonary nodules. (Tr. 1460). This was consistent with the findings at UKMC. (Tr. 1498-1504).

In March, 2009, however, Dr. Opoku-Owusu wrote a letter painting a dramatically different picture of his patient's health. He noted diagnoses of pulmonary histoplasmosis and pulmonary fibrosis, and stated there had been no improvement in exercise tolerance despite 12 months of treatment with the

medication itraconazole. (Tr. 1481, 1483). He asserted that a recent CT scan of the chest by Mr. Morris's pulmonologist at UKMC had showed "progression" of his pulmonary nodules and scarring. (Id.). In fact, the report of the January 19, 2009 CT scan from UKMC states that Mr. Morris had a few scattered lung nodules, which were stable compared to a scan from November, 2007; there was also "minimal" adenopathy which was likely unchanged from a prior study. (Tr. 1495). In any case, Dr. Opoku-Owusu asserted that his patient's exercise tolerance continued to decline and he was unable to walk more than a few hundred yards before becoming short of breath. (Tr. 1481, 1483). He asserted that the "consensus" reached by Mr. Morris's attending physicians was a further decline in pulmonary function over the next few years.

Dr. Opoku-Owusu completed a Physical Medical Assessment form on March 27, 2009 limiting Mr. Morris to sedentary level exertion, with unlimited sitting but standing and walking restricted to four hours per day, no more than 30 minutes at a time. He could "never" perform any postural activities, could occasionally reach, handle, feel, push and pull, and could never have any exposure to hazards or environmental irritants. Pain would constantly interfere with his attention and concentration, he would have to take up to six unscheduled breaks every eight hours, and he would be absent more than four days per month. (Tr. 1486-92).

In contrast to this dire picture, the contemporaneous treatment notes from UKMC show that although the plaintiff was complaining of numerous symptoms in

December, 2008, his pulmonary function testing showed only a mild obstruction. (Tr. 1504). He was also continuing to smoke. (Id.). A chest x-ray showed some granulomatous change which could be from "old" histoplasmosis, but it was not very prominent, and there was no acute process. (Tr. 1501). He was still experiencing "some" symptoms in January, 2009, but lung sounds were normal. (Tr. 1499-1500). Because he reported that an "outside" CT scan of the chest showed a worsening of his condition, the aforementioned new CT scan showing no changes was obtained. (Tr. 1495). He was again advised to stop smoking. (Tr. 1497).

The ALJ submitted the evidence to an ME, Dr. Robert Marshall, a specialist in internal medicine, for an opinion. (Tr. 1526). Dr. Marshall opined that Mr. Morris had x-ray changes classical for acute histoplasmosis but he had been appropriately treated for one year with an anti-fungal agent. (Tr. 1528). He reported that histoplasmosis was a self-healing disease that rarely had long-term complications. He interpreted pulmonary function testing as entirely normal, and said that chest x-rays showed no evidence of chronic obstructive pulmonary disease. (Id.). He found no problems physically related to the "healed" fungal infection. (Tr. 1529). His only other relevant condition was back pain, but imaging studies showed only mild degenerative changes and an examination by Dr. Rita Ratliff had found no evidence of limitation. (Tr. 389-95, 625, 627, 1529). Dr. Opoku-Owusu's limitations were not credible, because the nodules were long since healed and would not cause any symptoms. (Tr. 1531). He felt Dr. Opoku-Owusu's opinion was "wildly exaggerated

and unsupported by anything in the record." (Id.). He opined that the plaintiff could perform medium level exertion, with occasional crouching and crawling, and a need to avoid fumes. (Tr. 1533-38).

A July, 2009 office note from Dr. Opoku-Owusu describes the plaintiff's condition as "chronic and stable," and his examination showed normal breath sounds with no wheezing. (Tr. 1543). A new chest x-ray showed nodular densities not significantly changed since July, 2007, with the possibility of one right upper lobe nodule, which was not present in July, 2007 but was present on November 10, 2008. (Tr. 1545).

The ALJ then sought an opinion from another ME, Dr. Richard Gardner, a specialist in pulmonary disease. He stated that he agreed with Dr. Marshall's findings and restrictions. (Tr. 1549-60).

The ALJ relied on the opinions of the two MEs over the treating physician and said he afforded them "great weight." (Tr. 21). In fact, he gave them full weight and adopted their restrictions as his residual functional capacity finding. (Tr. 18).

The plaintiff raises only two fairly restricted issues on appeal.

First, he asserts that the ALJ erred in not proffering Dr. Gardner's evidence to him or his counsel before ruling on the case. The defendant has submitted a letter from the ALJ to the plaintiff's attorney, with a copy to the plaintiff, in which he did just that. Docket Entry 11-1. Although the letter was not originally included in

the court transcript, it appears that it was sent, and accordingly, this assignment of error is without merit.

Second, the plaintiff questions the ALJ's justification for not giving controlling weight to Dr. Opoku-Owusu's opinion. As he notes, when a treating source is not given controlling weight, the ALJ must consider six factors enumerated in 20 C.F.R. § 404.1527(d)(2) in determining what weight to give the opinion. Wilson v. Commissioner of Social Security, 378 F.3d 541, 544 (6th Cir. 2004). The plaintiff homes in on one of the six factors, however; the specialty of the treating source. He argues that Dr. Opoku-Owusu's medical specialty was not included in the administrative record, but cites the Kentucky Board of Medical Licensure website, http://web1.ky.gov/GenSearch/LicenseList, which shows that the physician is a specialist in infectious disease. He suggests that had the ALJ been aware of this factor, he might have weighted Dr. Opoku-Owusu's opinion more heavily. The court notes, however, that Dr. Gardner, as previously mentioned, was a specialist in pulmonary disease (Tr. 1560) and could reasonably be viewed as entitled to have as much or more weight than a specialist in infectious disease. The ultimate issue is the functional restrictions which resulted from the infectious disease, a matter a pulmonary specialist is singularly well placed to determine.

Moreover, § I-2-1-30(A) of the Commissioner's Hearings, Appeals and Litigation Law Manual (HALLEX), cited by the plaintiff for the proposition that the record must contain a copy of a health care professional's qualifications, contains

an exception for cases in which the physician's qualifications are adequately documented on his report or on another document. Dr. Opoku-Owusu's reports contain headings such as "Infections Disease Progress Note" (Tr. 729), and refer to his being in the ARH infectious disease service (Tr. 1358, 1378, 1380, 1385, 1427, 1429, 1431, 1434), while his disability letter of March 10, 2009 is signed "Bekoe Opoku-Owusu, MD/Infectious Diseases" (Tr. 1481). His specialty was quite adequately documented without a separate formal exhibit.

The decision will be affirmed.

This the 17th day of November, 2011.

**Signed By:**

***G. Wix Unthank***

**United States Senior Judge**